**TEXAS COUNTY IRRIGATION AND WA-
TER RESOURCES ASSOCIA-
TION, Appellant,**

v.

**Dan R. DUNNETT, Director of Conserva-
tion for the Corporation Commission of
the State of Oklahoma, Appellee,**

**Texaco, Inc. et al., Intervenors-Appellees.**

**No. 44989.**

Supreme Court of Oklahoma.

Oct. 15, 1974.

Victor W. Pryor, Jr., Holdenville, for appellant.

J. Frederick Lawson and Philip R. Wimbish, Tulsa, for appellee, Texaco Inc.

Royse Parr, Tulsa, for appellee, Mapco, Inc.

George W. Selinger, Tulsa, for appellee, Skelly Oil Co.

Robert F. LeBlanc, Charles A. Purser, Tulsa, for appellee, Cities Service Oil Co.

Irley A. Bonnette, Fort Worth, Tex., for appellee, Anadarko Production Co.

Wendell J. Doggett, Houston, Tex., C. C. Linley, Liberal, Kan., and Barth P. Walker, Oklahoma City, for appellee, Panhandle Eastern Pipe Line Co.

BARNES, Justice:

Appellant appeals order of Corporation Commission which permitted injection of salt water into the Glorietta Sand pursuant to rules and regulations set forth by the Commission.

There are many producing gas wells located in Texas and Cimarron Counties, Oklahoma, which produce salt water along with gas. This salt water must be disposed of by evaporation or pumped into disposal wells.

The Commission first authorized the disposal of salt water into the Glorietta Formation underlying portions of the Oklahoma Panhandle in April of 1959. Since 1959, there has been an almost continual injection of salt water into the Glorietta

Formation pursuant to permits issued by the Corporation Commission.

During the period of time covered by the Commission proceedings [April to October, 1970], there were approximately 30 salt water disposal wells injecting into the Glorietta.

In comparison to other alternative disposal zones, the Glorietta is shallow. In those areas where the Glorietta is suitable for disposal operations, it is the preferred zone based on economic considerations of oil and gas production. It would cost approximately $40,000 per well to dispose of salt water into the Council Grove Formation.

The Glorietta Formation spreads out under parts of New Mexico, Texas, Oklahoma, and Kansas. In those portions of Oklahoma's Texas and Cimarron Counties, where Glorietta disposal operations are being carried on, it averages 200 feet in thickness.

The Glorietta Formation will take water readily on a vacuum. Under normal circumstances, no surface pressure is needed to inject salt water into it.

In Texas and Cimarron Counties, the Ogallala Formation is a fresh water aquifer and overlies the Glorietta Formation. The Ogallala does not exist as a fresh water source in portions of the southeast corner of Texas County or in much of Beaver County.

The Glorietta Formation is not present in all of the area concerned. It pinches out near the Texas County-Beaver County line. It undergoes a facies change in portions of Cimarron County. In those areas, it is not suitable for disposal purposes. The Glorietta Formation is not well suited for salt water disposal in the southern portions of Texas County.

In those portions of the Oklahoma Panhandle where the Ogallala and the Glorietta Formations both clearly exist, they are separated by what is commonly referred to as "Red Beds". In the area where most of the Glorietta disposal wells are located, the thickness of the intervening Red Beds ranges from 700 to 900 feet. The Red Beds consist of sandstone, shale and evaporities. The Red Beds are relatively impermeable when undisturbed.

At the time of the hearing before the Commission, the volumes of salt water being injected into the Glorietta disposal wells in Texas and Cimarron Counties ranged from a barrel a day to 490 barrels a day per well. At that time, most of the Glorietta disposal wells were injecting less than 200 barrels of water a day into the Formation.

Two conditions must exist before it is possible for the salt water injected into the Glorietta Formation to pollute Ogallala fresh water: [1] The potentiometric surface of the Glorietta water must be higher than the top [not the base] of the Ogallala water; and [2] A conduit for communication between the two formations must exist. The testimony was in dispute as to whether these conditions existed.

After extended hearings, the Corporation Commission ordered that within 90 days from the date of the order all disposal and injection wells which used the Glorietta Sand in Cimarron, Beaver, and Texas Counties were to be brought into compliance with specific rules and regulations which it set forth in its order. The Commission found that it "would appear the Ogallala aquifer is not being polluted by water being injected into the Glorietta." It also found that the evidence before the Commission as to salt output is that in most areas the salt and chloride content is such as to make its use as a source of water for irrigation, industry and human consumption impractical at this time, and therefore it would be "unfair" to prohibit the use of the Glorietta as a salt water disposal zone until there was evidence that it could be utilized as a water source. The Commission also found that efforts are underway to conduct more scientific testing and that it would therefore retain jurisdiction over this matter.

■ Appellant, Texas County Irrigation and Water Resources Association [Asso-

ciation], argues that the finding of the Commission that disposal or injection of salt water into the Glorietta Sand would not pollute the fresh water bearing Ogallala aquifer was not supported by substantial evidence.

Intervenors cite St. Louis-San Francisco Ry. Co. v. State, Okl., 262 P.2d 168, for the assertion that if there is evidence which reasonably tends to support the order it must be sustained.

Under Art. IX, § 20, of the Oklahoma Constitution, this Court's review shall not extend further than to determine whether the Commission's "findings and conclusions . . . are sustained by . . . substantial evidence." In City of Edmond v. Corporation Commission of Oklahoma, Okl., 501 P.2d 211, we followed Cameron v. Corporation Commission, Okl., 414 P.2d 266, and quoted the following language therefrom:

"2. The Corporation Commission has a wide discretion in the performance of its statutory duties and this court may not substitute its judgment on disputed questions of fact for that of the Commission, unless the findings of the Commission are not supported by the law and substantial evidence.

"3. The determination whether there is 'substantial evidence' to support an order made by Corporation Commission does not require that the evidence be weighed, but only that the evidence tending to support the order be considered to determine whether it implies a quality of proof which induces the conviction that the order was proper or furnishes a substantial basis of facts from which the issue tendered could be reasonably resolved."

The rule stated in "3" above does not mean categorically that this Court examines only the evidence tending to support a challenged Corporation Commission order, for this could mean [among other things] blinding ourselves to other parts of the record showing admitted or undisputed facts irreconcilable therewith. See Skelly

Oil Co. v. Corporation Commission, 183 Okl. 364, 82 P.2d 1009, and Northwest Oil Company v. Railroad Commission [Tex. App.], 462 S.W.2d 371, 378, quoting Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022. It merely means that we will not consider, for the purpose of determining preponderance or comparative weight, both the evidence tending to support the order, and that which does not, because of our Constitution-mandated limitation of power [Crews v. Champlin Oil & Refining Co., Okl., 413 P.2d 508] and the presumption of correctness that accompanies appeals from that tribunal in matters it frequently adjudicates and in which it possesses expertise. See Ward v. Corporation Commission, Okl., 470 P.2d 993, 996, and Peppers Refining Co. v. Corporation Commission, 198 Okl. 457, 179 P.2d 899, 904.

After examining the record and applying the above-described rule, we cannot say that the subject order and its challenged findings of fact are not substantially supported by the evidence.

In studying the record, we note that there are a number of recommendations that no further permits be granted to dispose of salt water in the Glorietta Formation until additional information is obtained to better determine if subsurface fluid may be migrating from the Glorietta to the Ogallala. Some of these statements and recommendations may be referred to or described as follows:

[Exhibit No. 31] Oklahoma State Department of Health:

"U.S. Geological Survey and Federal Water Quality Administration indicate that the potential for pollution may exist and that additional studies are needed to evaluate the potential for pollution of the fresh water sources by the brine injections in the Glorietta. This is confirmed by published material in U.S. Geological Survey Circular No. 630, dated 1969, in which the statement is made that the data available to this agency is insufficient to prove or disprove the presence of hydro-

logic interconnections between the Glorietta and overlying fresh water aquifers.

"Because of these differences of opinion, a study needs to be made to provide the data necessary to resolve these diverse positions. Until this study is completed and the information is made available to all concerned, we respectfully request that the present injection operations be restricted to a level that will minimize the potential for pollution of the fresh water sources in the Ogallala and that *no new injection wells be permitted unless done in connection with and contributing to the study.*" [Emphasis ours.]

[Exhibit No. 33] Letter of similar import from Oklahoma Department of Agriculture:

" * * * we would prefer that risks of potential pollution of the fresh water zones be kept at the very minimum. This might necessitate consideration of a policy of no new authorizations for salt water disposal wells in the area until the study is complete and the recommendations evaluated."

[Exhibit No. 38] Similar recommendation by Oklahoma Water Users Association, Inc.

[Exhibit No. 53] Paper entitled "DETERMINATION OF POLLUTIONAL POTENTIAL OF THE OGALLALA AQUIFER BY SALT WATER INJECTION".

Task-force efforts of Committee for the Comprehensive Studies of Fresh Water in Western Oklahoma, which is headed by the Chairman of the Oklahoma Water Resources Board and includes representation from the U.S. Geological Survey, Mid-Continent Oil and Gas Association, Oklahoma State University, and Texas County [Oklahoma] Irrigation and Water Users Association, Oklahoma Geological Survey, and Federal Water Quality Administration, have tentatively concluded that for this matter to be resolved satisfactorily considerable data will have to be obtained and evaluated. This data will concern the following subjects:

"1. Fluid static pressures of the Glorietta Formation.

"2. Relationships of the fluid pressures of the Glorietta to the water levels in the Ogallala Aquifer.

"3. Hydraulic characteristics of the Glorietta Formation. (These characteristics determine the increase in fluid pressures and extent of the change that would result from injection into the Formation.)

"4. Injection volumes and rates of existing installation.

"5. Presence or absence of improperly abandoned or unplugged oil and gas tests and wells.

"6. Information on surface casing and cementing programs of producing and abandoned oil and gas wells with respect to protection of freshwater strata.

"7. Relationship of surface casings to the base of the *Ogallala Formation* to determine adequacy of protection afforded the Ogallala."

[Exhibit No. 63–A] Kerr Lab study entitled "DETERMINATION OF POLLUTIONAL POTENTIAL OF THE OGALLALA AQUIFER BY SALT WATER INJECTION."

" * * * the Federal Water Quality Administration has prepared a Policy on Disposal of Wastes by Subsurface Injection. * * * In relation to the Ogallala-Glorietta question, the policy encourages that such disposal be used only after it has been demonstrated as the best alternative in terms of environmental protection and then only on a temporary basis until better waste disposal practices can be developed."

This report also made several recommendations.

As we have already noted, the Commission by its order retained jurisdiction of this matter in order to render in the future

the necessary and appropriate relief based upon the evidence which is obtained by testing the Glorietta Sand.

■ Appellants in their second proposition argue that the Corporation Commission has appropriated the Glorietta Formation from the surface owners for the use of oil and gas companies without due process of law. We answered this argument in the case of West Edmond Salt Water Disposal Ass'n. et al, v. Rosecrans, 204 Okl. 9, 226 P.2d 965, 340 U.S. 924, 71 S.Ct. 500, 95 L.Ed. 667. There, as here, plaintiffs did not contend, and made no effort to prove, that any damage had resulted to them by the injections of salt water. There we stated [226 P.2d p. 973]:

"The applicable and governing principle in this case is the rule of reasonable use, that is, that a person may use his property in any lawful manner, except that he may not use it so as to injure or damage his neighbor."

In accord with the views expressed herein, we have concluded that the order appealed from is neither contrary to law nor without sufficient evidentiary support. Said order is therefore affirmed.

DAVISON, C. J., WILLIAMS, V. C. J., and IRWIN, BERRY and LAVENDER, JJ., concur.

HODGES, SIMMS and DOOLIN, JJ., dissent.

HODGES, Justice (dissenting).

The Oklahoma Constitution Art. 9 § 20 provides in pertinent part:

" * * * The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the re-

view by the Supreme Court shall not extend further that to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from. * * *"

The leading case in Oklahoma involving the substantial evidence rule is Yellow Transit Co. v. State, 198 Okl. 229, 178 P.2d 83 (1947). This case involved an appeal from the Corporation Commission. It stands for the premise that the determination of whether there is substantial evidence to support an order of the commission does not require the evidence be weighed, but only that the evidence tending to support the order be considered. The factors to be considered in determining this are whether the evidence implies a quality of proof which induces the conviction that the order was proper or furnished a substantial basis of facts from which the issue tendered could be reasonably resolved.

The application of this rule has recently been modified by Brown v. Banking Board, 512 P.2d 166, 167 (Okl.1973). In Brown, we held that the reviewing court shall look to the entire record and take into account not only that evidence which supports the order, but the evidence contrary to the order in its determination as to whether there is substantial evidence in the record to support the order. The majority has ignored this modification of substantial evidence, and in effect, has imposed a different standard for Corporation Commission cases.

The Brown decision recognized the substantial evidence rule as promulgated by the U.S. Supreme Court in Universal Camera Corp. v. National L. R. Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951):

"The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. * * *.

To be sure, the requirement for canvassing "the whole record" in order to assertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fair conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

One of the arguments in favor of considering only the evidence which "reasonably tends to support the Commission's order" is that the Commission has a high degree of expertise in matters presented to it. This was effectively refuted in Universal Camera in recognizing that substantial evidence requires scrutiny of the record in its entirety including evidence opposed to the finding.

The syllabus in the Brown case holds, 512 P.2d at 167:

"In determining whether there is substantial evidence in the record to support the order of the Banking Board, the reviewing court shall look to the entire record and take into account not only that evidence which supports the Banking Board's view, but also the evidence contradictory to the view of the Banking Board."

There is no rational reason that one definition of substantial evidence be applied to banking cases and another to Corporation Commission cases. The majority opinion promotes what this Court rejected in Dancy v. Owens, 126 Okl. 37, 258 P. 879, 882 (1927), the creation of a court of co-ordinate final jurisdiction.

In the Dancy case, the court stated:

"There can be no doubt about the supremacy of the Supreme Court. This court is placed by the Constitution at the head of the judicial system of the state."

The definition of substantial evidence supported by the majority negates and ignores the supremacy of this court.

Whether the Ogallala aquifer is being polluted or will be polluted, are really unknowns. It is also a matter of controversy, and a question of scientific advancement as to whether the Glorietta sand may ever be utilized for irrigation and fresh water supply purposes.

However, there was testimony that pollution had already occurred, even though the cause of pollution was not established. Phillips Petroleum Co., one of the major oil and gas producers in the Panhandle area dispensed with disposal of salt water into the Glorietta sand in 1967, because they believed it was in the interest of all concerned.

Testimony was heard that the Glorietta is permeable in some locations and migration of polluted water was quite possible.

Although it was not proven that the disposal of salt water resulted in pollution, we held in Eason Oil Co. v. Uhls, 518 P.2d 50 (Okl.1974) that where the water supply might be polluted or contaminated by drilling, drilling would not be permitted. While recognizing the Eason case was not a Corporation Commission case, but an appeal from a trial court's judgment, it is, in my opinion in conflict with the majority opinion.

The real peril involved in this case is that locally the water table can be pulled

below the potentiometric surface in the Glorietta and if any type of conduit exists in the area, the water is free to migrate into the fresh water aquifer and the actual influence of increasing the hydrostatic pressure in the Glorietta by continued additional injection of salt water and other waste in such dangerous areas would increase the potential for or add to pollution. It is in this area where the intervenors have failed to show to the court any substantial evidence which would protect against pollution of the fresh water supply in the Ogallala formation.

It is undisputed that a deeper formation, the Council Grove formation, is available for disposal without danger of pollution. Intervenors contend that it is economically unfeasible to inject the salt water into deeper formations and that to do so would require that production be halted on certain wells. This is unfortunate, if true, but financial loss to an individual, firm, or corporation affords no adequate ground for impeding or standing in the way of the general government and promotion of public welfare. See Eason Oil Co. v. Uhls supra; Van Meter v. H. F. Wilcox Oil & Gas Co., 170 Okl. 604, 41 P.2d 904, 909 (1935). Especially so in the present case, where the Ogallala formation is the only source of water available in the area. As long as there are attending dangers of pollution to this sole source of water supply, then the economic considerations of the private sector should give way to a more ultimate concern—the people.

Until such time as all the risks have been scientifically analyzed, and reduced to an acceptable level I would enjoin the Corporation Commission from granting any further applications for disposal of salt water into the Glorietta formation, and that proper phasing out procedures be adopted for the existing eleven disposal and/or injection wells.

I, therefore, respectfully, dissent.

I am authorized to state that Justice SIMMS and Justice DOOLIN concur in the views herein expressed.