**EL PASO NATURAL GAS COMPANY, Appellant,**

v.

**CORPORATION COMMISSION OF the STATE OF OKLAHOMA, and Leede Exploration Company, Appellees.**

No. 53236.

Supreme Court of Oklahoma.

Dec. 8, 1981.

Rehearing Denied March 8, 1982.

Robert J. Emery and James M. Gaitis, Robert J. Emery & Associates, Oklahoma City, and David T. Burleson, El Paso, Tex., for appellant.

H. B. Watson, Jr., Richard K. Books, Watson, McKenzie & Moricoli, Oklahoma City, for appellee.

PER CURIAM:

The Oklahoma Corporation Commission (Commission), upon application by Leede Exploration Company (Leede), ordered the de-spacing of two 1440-acre drilling units in Washita and Beckham Counties. It ordered the establishment of six 640-acre spacing units encompassing land from the larger de-spaced units. The new units are spaced for five formations, lower Morrow through Hunton.

When the initial Corporation Commission spacing order went into effect in 1973, there were no commercially producing wells in the area. One well (McCullah Easley) had been drilled. It was abandoned, but later reopened. Since that time three more wells (Harrison, Niece 1 & 2) have been drilled, south of major fault, and two are producing. Two more gas wells became producers following the hearing before the Corporation Commission. In addition, two wells have been drilled north of the major fault (GHK Miller and Green).

El Paso Natural Gas Company (El Paso) appeals the decision of Corporation Commission changing spacing from 1440 to 640, contending such change is invalid as a collateral attack on a final order of the Commission because no substantial change in conditions or substantial change in knowledge of conditions in the area was proved.

The Commission heard evidence November 20 and December 1, 1978, and granted Leede's application December 22, 1978. El Paso filed a motion for rehearing based on newly discovered evidence, but such motion was denied January 19, 1979. El Paso appealed and the Court of Appeals ordered the Commission to take such new evidence not available November 20, but available January 19th. Hearing was held on July 28, 1980. Evidence was received but no change in original order of Corporation Commission was made, nor was any notation of Commission consideration made. Original assignment to Court of Appeals was rescinded and case was assigned to this Court.

El Paso argues its newly discovered evidence, two additional producing wells completed subsequent to December 22, 1978, demonstrates that no substantial change in conditions or substantial change in knowledge of conditions had occurred which would necessitate a geologic re-evaluation of the formations in question. It further argues the new evidence shows the common

sources of supply are continuous throughout the area and consequently the de-spacing order is violative of 52 O.S.Supp.1980 § 87.1 since said order established non-uniform drilling and spacing units overlying a single common source of supply, and fails to protect the correlative rights of interested parties. The new 640-acre units would be contiguous with larger 1440-acre units.

## I

■ Art. 9 § 20 of the Oklahoma Constitution mandates we utilize a "substantial evidence" test for reviewing decisions of the Oklahoma Corporation Commission. Under such rule the determination of whether substantial evidence exists to support a Corporation Commission order does not require that the evidence be weighed, only that there be evidence tending to support such order. (*Yellow Transit Co. v. State*, 198 Okl. 229, 178 P.2d 83 (Okl.1947).

El Paso would have this Court modify that rule to include a review of *all* evidence presented. In fact, El Paso said we made such modification in *Brown v. Banking Board*, 512 P.2d 166 (Okl.1973), and urges adoption of the dissent of Justice Hodges in *Texas County Irrigation & Water Resources Association v. Dunnett*, 527 P.2d 578 (Okl. 1974), which suggests the entire record should be scrutinized.[1]

A review of the law leads us to the conclusion that El Paso's point is well taken.

■ The Oklahoma Constitution, Art. 9 § 20 provides that in appeals from Corporation Commission orders, other than constitutional issues, this Court shall determine only "whether the findings and conclusions of the Commission are sustained by the law and substantial evidence." We hereby adopt the definition of the United States Supreme Court that "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corporation v. National Labor Relations Board*, 340 U.S.

---

1. Also see our recent decision of *Union Texas Petroleum v. Corporation Commission*, 52 OBJ 1857, 1864, (1981), and "Modification of Corporation Commission Orders pertaining to a common source of Supply" by Howard H. Harris, 11 Oklahoma Law Review 125 (1958).

474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). That portion of *Texas County Irrigation and Water Resources Association v. Dunnett,* supra, which holds to the contrary is expressly overruled.

## II—SUMMARY COMMISSION ORDER

The Commission order re-spacing the area gave fourteen reasons for concluding there had been a change in knowledge of conditions in the common sources of supply, gained from additional seismic exploration and the drilling and completion of wells. The principal ones include:

—The Springer formation is a fractured formation that produces only in sections with favorable porosity and permeability; these producing characteristics are not continuous throughout the area, thus increasing the possibility of a dry hole;

—The price of natural gas has risen from 21 cents per mcf in 1973 to over $2.00 per mcf in 1979, and continues its upward trend, and while it *was* uneconomical to drill on a 640-acre pattern in 1973, it is now economical to drill in that spacing pattern;

—It is questionable whether the field could be drained completely with 1,440 acre spacing;

—Four of the 1,440 acre units contain acreage on both sides of a major sealing fault which was unknown in 1973; therefore some acreage will not contribute to a unit well.

## III—EVIDENCE

(a) A Leede exploration manager testified that both the Morrow and Springer formations contained discontiguous sands; and there is additional discontinuity as to porosity and permeability, as evidenced by the fact that two wells drilled to the Springer formation proved noncommercial but a third well (Niece well) in the same formation was producing 21 mcf per day. He also testified some zones in the Morrow and Springer formations are not present in wells drilled after the 1973 order.

(b) Another Leede witness testified the Niece well produced from a highly frac-tured reservoir, and once the fractures were drained they filled again to limit deliverability from the well. This would result in drainage of a small area. The witness states the pressure from the Niece No. 2 well dropped periodically from 14,000 to 8,000 psi and at such low psi, the well was shut-in to allow build-up of pressure.

(c) Economic Conditions. Leede presented evidence that in 1973 it would *not* have been economically feasible to drill on 640-acre spacing units, and under such spacing a net loss of $635,000 per unit would have resulted for gas was selling for 21 cents per mcf. He concluded that in 1978, with the cost of gas at nearly $2.00 per mcf, the 1973 loss would change to a $14 million profit for 640-acre spacing units.

(d) Leede Division Exploration Manager testified:

—"The reason we are asking for vacation of these larger units is that: (1) We don't feel they can be drained on 1,440 units and (2) we are going to find the likelihood of generating more reservoirs by drilling on the smaller units."

—"You can see discontinuous beds in the Upper Morrow. We again see discontinuity in the Lower Morrow. The same holds true for Lower Springer. There is discontinuous porosity and permeability. Even though there is continuity of the zones that is correlatable, there is not continuity in the zones as far as production is concerned."

—"A lack of continuity of course would affect the limits of the reservoir in the well bore."

—"Some of the zones absolutely do not show up in the well bores of some of the intervening wells."

—"There could be continuity of the zones and within that there is discontinuous porosity and permeability."

—"There is a good likelihood they (Niece 2 and Kilhoffer wells) could be discontinuous."

—"There is discontinuity of these reservoirs that came about during deposition

that's stratigraphic. There is additional discontinuity that could be induced by faulting associated with the fault of this magnitude."

—"It is going to require smaller spacing in order to adequately drain these individual reservoirs."

—"There very well could be discontinuity in the Springer. If I were weighing that possibility, I would say that it's greater that it would be discontinuous."

—"I have no geological evidence per se. It is my qualified opinion that because of the stratigraphy in the structure, that could very well be discontinuous within reservoir rock."

—"Even though there is continuity of the correlative zones, there is discontinuity in seperation of these zones in the well bores that can be established by faulting and/or production testing."

(e) Consulting Engineer-Geologist to Leede testified as follows:

—"One well will not drain 1,440 acres."

—"The more penetrations, the higher the ultimate recovery. I do not believe that the producing characteristics of the well will allow it to drain fully 1,440 acres."

—(Describing the reservoir): "As you void that gas, the cracks would close. Now that's something I can't prove but that is my professional conception of the way this reservoir is constituted."

## IV

In applicable part, section 111, 52 O.S. 1971 provides:

"No collateral attack shall be allowed upon orders, rules and regulations of the Commission made hereunder, but the sole method of reviewing such orders and inquiring into and determining their validity, justness, reasonableness or correctness shall be by appeal from such orders, rules or regulations to the Supreme Court."

In applying this statute to determine the validity of an order modifying a prior spacing order of the Commission, we have stated the authority to modify must necessarily involve a changed factual situation from that existing at the time of the prior order. Otherwise, the proceeding in which the modification order was entered would constitute an unauthorized collateral attack upon the original order. See *Wood Oil Co. v. Corporation Commission*, 205 Okl. 537, 239 P.2d 1023 (1950); *Carter Oil Co. v. State*, 205 Okl. 374, 238 P.2d 300 (1951). In the first paragraph of the syllabus in *Cameron v. Corporation Commission*, 414 P.2d 266 (Okl.1966), we held:

"The Corporation Commission is without authority to entertain or grant an application to vacate, amend or modify a spacing and well drilling unit established by a former order of The Commission which has become final, *in the absence of a showing* of a substantial change of knowledge of conditions existing in the area since the former order was made or other change of factual situations specified in the statutes." (Emphasis supplied).

In *Phillips Petroleum Co. v. Corporation Commission*, 461 P.2d 597 (Okl.1969), we quoted with approval the following language from Harris, "Modification Order Pertaining to a Common Source of Supply," 11 Okl.Law.Rev. at pp. 132–133:

" . . . Because substituted substantive rights actually vest in the property owners by the force of such orders, the Oklahoma Supreme Court has laid down the rule that a modifying order will be condemned as a prohibitive collateral attack unless a 'substantial change of condition' has intervened between the dates of the existing and the superseding orders. What constitutes a change of condition sufficient to satisfy the requirement? As a logical proposition, three kinds of change of condition are theoretically possible. The first may be designated as an internal change of condition. It is characterized by an actual change in the physical behavior of the reservoir occasioned by development and depletion. Such a change may or may not be predictable in the early stages of development . . . . The second kind may be called an exter-

nal change of condition. In this instance, the physical behavior of the reservoir remains constant, but the information gained through development or depletion experience demonstrates that the conclusions reached originally were incorrect. . . . An external change of condition is characterized by the fact that the animal was incorrectly described in the first instance—the dog was called a cat and the mistake was discovered later. That such a change of condition satisfies the legal requirement is supported by the first *Peppers* case, (*Application of Peppers Refining Co.*, Okl., 272 P.2d 416 (1954). The third possible kind of change of condition defies tagging with an appropriate label. . . . In this case no actual change in the physical behavior of the reservoir is experienced, . . . . Nevertheless, new scientific knowledge and technology may add new dimensions to the basic legal concepts of waste and correlative rights, or the statutes may be superseded by others which re-define these terms."

When the testimony and evidence given by Leede's expert witnesses are compared with the law, we are convinced the Corporation Commission was presented sufficient evidence to hold a substantial change in knowledge of conditions existed, and to authorize a change in the spacing from 1,440 acres to 640 acres.

The argument of a change in the economics of drilling and sale of natural gas is new to Oklahoma. We first discussed the issue in the recent case of *Kuykendall v. Corporation Commission*, 52 OBJ 2183, 634 P.2d 711 (Okl.1981), wherein we said economics "is only one factor to be considered, and its persuasiveness must not only be tempered by other pertinent considerations which may override its influence, but which may well displace it." In the case at bar we find economics was but one of several factors considered by the Corporation Commission, and other evidence presented did not negate its persuasive character.

El Paso also seeks to have the order reversed on grounds the Corporation Com-

mission erred in refusing to reopen the hearing to accept "newly discovered evidence" in the form of logs from two new wells completed since the hearing ended. El Paso admits this new evidence merely augments its prior evidence. We are not persuaded.

The order of the Corporation Commission is supported by substantial evidence.

AFFIRMED.

IRWIN, C. J., BARNES, V. C. J., and HODGES, SIMMS, DOOLIN and OPALA, JJ., concur.

LAVENDER and HARGRAVE, JJ., concur in part; dissent in part.