**TELECO, INC., Commercial Communications, Inc., Executone of Oklahoma, Inc., and Bill Patterson, Appellants,**

v.

**CORPORATION COMMISSION of the State of Oklahoma, the State of Oklahoma, and Southwestern Bell Telephone Company, Appellees.**

No. 51961.

Supreme Court of Oklahoma.

Oct. 19, 1982.

Arnold T. Fleig, Speck, Philbin, Fleig, Trudgeon & Lutz, Oklahoma City, for appellants.

Robert D. Allen, O. Carey Epps, Oklahoma City, for appellees.

OPALA, Justice:

Three issues are presented for decision: [1] Did the Corporation Commission order violate policies of the Federal Communications Commission? [2] Does the order unconstitutionally discriminate against those Southwestern Bell customers who use their own telephone equipment? and [3] Was there substantial evidence to support the Commission's allowance of a 30¢ credit rate to subscribers with privately-owned terminal equipment? We answer the first two questions in the negative and the last one in the affirmative.

In its application to the Corporation Commission [Commission] Southwestern Bell [Bell] sought approval of certain changes in its intrastate tariff structure for Oklahoma. All tendered proposals dealt with implementation of the "equipment registration program" mandated by the Federal Communications Commission [FCC].[1] By the "equipment registration program" telephone companies were required, *inter alia,* to recognize a new class of customers with privately-owned terminal equipment (telephones, phone jacks and wiring).

For implementing this new customer service Bell needed an authorized credit rate for registered terminal equipment owners.[2] Bell proposed a monthly instrument credit of 60¢ to customers who use their own telephone. This figure was based on Bell's cost savings analysis. The proposed credit rate represented what Bell would save by not having to provide its own instrument. Protestants (appellants herein)—telephone users and suppliers of terminal equipment—pressed for a monthly per-instrument credit of $1.15. This equalled Bell's then-obtaining charge to its customers for a Bell-provided extension telephone. The protestants appeal from the Commission order allowing a credit rate of 30¢.

I.

THE COMMISSION'S ORDER DOES NOT VIOLATE FCC POLICY

The order under review establishes a credit rate for Bell customers who provide their own terminal equipment. This was done to comply with FCC policy which necessitates a restructuring of rates for complete "end-to-end" service to customers with self-owned terminal equipment. A credit approach taken in this case fairly implements the FCC program of "unbundling telephone service" to allow free competition for the manufacture and sale of terminal equipment as well as to give every customer a choice between either buying one's own instrument or leasing it from Bell. It was within the Commission's legislative discretion to choose the appropriate method for effecting Bell's compliance with FCC regulations that affected it as an intrastate public utility.[3]

II.

THE COMMISSION'S ORDER IS NOT CONSTITUTIONALLY IMPERMISSIBLE

The protestants urge that the Commission's order violates state and federal

---

1. 47 F.C.R. 68. Under the FCC program, registered and grandfathered equipment may be directly connected to, and used with, the telephone company's facilities by customers of the regulated telephone company.

2. The FCC left to the state regulatory agencies the burden of establishing procedures to be followed in adapting tariffed intrastate and exchange services, or the rates and charges prescribed for such services, to the FCC-mandated equipment registration program.

3. Art. 9 § 18, Okl. Const.; 17 O.S.1981 § 151 et seq.; *State ex rel. Cartwright v. ONG,* Okl., 640 P.2d 1341, 1350 [1982].

constitutions because it discriminates between Bell's extension service customers who receive a 30¢ credit for providing their own telephone instruments and those who have Bell-supplied terminal equipment. The import of their argument is that customers with privately-owned telephones are unjustly charged an additional 85¢ for extension service ($1.15 minus the 30¢ credit) when no extra service is performed by Bell. This view lacks merit because in Oklahoma Bell subscribers are charged for the "value of service" which may vary with the type of service provided. The credit represents only the cost savings Bell is likely to realize from not having to provide a telephone instrument; it is not intended as a refund for the entire service. This court has recognized the Commission's authority to "discriminate" between utility customers so long as the action is not unjust or unreasonable.[4] There is more than one theory or formula for rate making which the Commission might adopt. Neither the "cost of service" nor "value of service" affords an exclusive or a favored formula.[5]

## III.

### THE COMMISSION'S ORDER IS SUPPORTED BY SUBSTANTIAL EVIDENCE VIEWED IN ITS TOTALITY

In reviewing Commission orders this court is required to determine if the order is sustained by law and supported by substantial evidence.[6] An appeal here is for judicial review only, and this court is required to exercise its own independent judgment as to both law and facts.[7] The determination of whether there is substantial evidence in support of the Commission's findings does not require that the evidence be weighed, but only that the totality of the record be examined and the proof found to be "more than mere scintilla".[8] The evidence should be found to possess something of substance and of relevant consequence—something that carries with it fitness to induce conviction.[9] There is a presumption of correctness that accompanies the findings of the Commission in matters it frequently adjudicates and in which it possesses expertise.[10] In the performance of its duties the Commission has wide discretion, and this Court may not substitute its judgment on disputed questions of fact unless the findings are contrary to law or unsupported by substantial evidence.[11]

The order reflects that various factors were of concern to the Commission in establishing the "credit" rate for customer-owned equipment. *First,* there was the lack of an experience period for determining the effect of customer-owned telephones on the existing operations and on the revenue needs of the telephone company. Because the broad averages used in the cost study were based on large numbers, the Commission justifiably entertained fears that it would not be until a sufficiently large number of Bell-provided telephones were replaced with customer-supplied instruments that Bell could experience a reduction in its costs as a result of the FCC-mandated program. The decrease to be expected could not occur until a "period of time [will have elapsed which was] long enough to be reflected in the overall costs of operations." A *second* concern of the

---

**4.** *Application of Southwestern Bell Tele. Co.,* Okl., 575 P.2d 624, 627 [1978].

**5.** *Application of Southwestern Bell Tele. Co.,* supra note 4 at 627.

**6.** *Tecumseh Gas System Inc. v. State,* Okl., 565 P.2d 356, 359 [1977]; Art. 9 § 20, Okl. Const.

**7.** Art. 9 § 20, Okl. Const.

**8.** We adopted in *El Paso Natural Gas v. Corporation Commission,* Okl., 640 P.2d 1336, 1338 [1982], the so-called totality-of-evidence standard for our review of corporation commission decisions. Federal Supreme Court jurisprudence is entirely consistent with our view. *Universal Camera Corporation v. National Labor Relations Board,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 [1951].

**9.** *Tecumseh Gas System Inc. v. State,* supra note 6 at 359.

**10.** *Tecumseh Gas System Inc. v. State,* supra note 6 at 359.

**11.** *Bishop v. Corporation Commission,* Okl., 394 P.2d 235, 236 [1964].

Commission was the difference in the theory now used to compute the rate of basic services for company-supplied equipment (value-of-services) and the proposed approach for credit on extension services to customers with privately-owned telephones (cost-of-services). The use of the latter basis (cost-of-services) would have resulted in a higher credit rate allowance, while the former formula (value-of-services) would have brought about a lower rate of credit. *Third,* the cost study did not take into consideration a proper allocation for both interstate and intrastate functions. Using the pure cost theory, the Commission noted, the credit rate would be lowered only by a third while under the "savable costs basis" the credit rate would be reduced by more than one half. *Fourth,* Bell's cost study included items which, in the Commission's expert opinion, were unlikely to decrease with the introduction of customer-owned equipment. These items consisted of maintenance and administration expenses. Bell's position that such items would drop was viewed as an unrealistic estimate for the "foreseeable future".

All of these concerns were clearly unveiled during the Commission hearing. Agency counsel expressly advised the parties the Commission would have to weigh the various factors included in the cost study and might accord less weight to some of the cost items estimated in Bell's study. The problem was identified as one of selecting the suitable theory for gauging the amount of credit to be allowed. The Commission's counsel disagreed with Bell's *pure cost analysis* for ascertaining the credit rate allowance because the actual rate for basic services is generally determined on a *value-of-services approach.* Bell's explanation for its analysis was that it was dealing with a credit allowance on equipment instead of a proposed rate increase of an existing tariff. Inasmuch as it had no prior experience in fashioning a formula for fixing a credit rate for services no longer provided, Bell's view was that a cost analysis was the only way to establish such a rate. Bell's problem in implementing the new FCC program is multi-faceted: (a) the development of a

new class of customers and a new class of service, (b) operating under a present tariff that is structured on rates for all basic services which include the provision of telephone instruments and (c) the legal requirement of allowing credit to a small class of users for a portion of the extension service expense which is no longer incurred by the class. Bell aptly described this situation as being "in a new ballgame".

Commission counsel emphasized during the hearing that the Commission's function was one of setting the decreased rate at the level which is in the overall public interest. Counsel expressed concern that it was premature to project a proper credit rate and that Bell's proposal may not turn out to be fully compensatory to the utility.

The protestants offered no aid by demonstrating a sounder approach to allocating equipment credit. Their only argument was that the credit allowance should equal the present rate charge for extension service with Bell-provided equipment. This, of course, assumes that the present rate includes no costs other than the telephone itself—an assumption the Commission rejected as unfounded. Other cost factors noted in the order as being comprised in the existing rate consist of inside wiring, its maintenance and repair, the use of the exchange network from alternate locations as well as miscellaneous value items of service considerations.

The proceeding instituted by Bell was not one for an across-the-board revision in the existing tariff structure but rather one to implement the FCC-mandated registration equipment program through certain narrowly-targeted changes to benefit but a small class of customers—those who will provide their own telephone instruments. No evidence was presented as to the interrelationship of the credit allowance to be approved with the totality of the existing intrastate tariff structure. Since Bell had neither experience nor empirical data dealing with the services to be discontinued, it could not show the anticipated impact of

the change on the total rate structure.[12] The recommended 60¢ credit, based on an unacceptable cost analysis, was Bell's preliminary approach to the problem of complying with the federal mandate.

This court has the duty to determine whether a rate order under review may reasonably be expected to maintain financial integrity for the affected utility and yet provide appropriate protection to the relevant public interest, both present and foreseeable. Within the Commission's larger responsibility to oversee and preserve the integrity of the rate structure is its charge of preventing one class of rate payers from subsidizing another by paying more than its fair share. This factor is of critical concern to the Commission when it is called upon to structure rates in a new arena—as it was the case here—without the benefit of an experience period. The Commission's order reflects a well-founded apprehension that an overbroad credit allowance might have an adverse impact on the total revenue needs within the framework of the existing rate structure.[13] The Commission was constrained to deal with the problem in a narrow channel. It doubtless intended its authorized credit rate as a temporary measure until the full impact of the new federally-mandated program can be further studied and adequately assessed.

In summary, the totality of the evidence reveals that the Commission order is sustained by substantial evidence supporting the protective posture the regulatory body assumed in the public interest of maintaining the financial integrity of existing tariff structure until an experience period will have revealed the proper approach to be pursued.

IV.

## DUE PROCESS ANALYSIS OF THE EVIDENCE

■ Another question here is whether the minimum standards of due process were in fact met at the hearing below. Those standards are found in 75 O.S.1981 § 310(4) of the Administrative Procedures Act and apply to Commission hearings although the act does not govern that body.[14] That section provides:

"Notice may be taken of judicially cognizable facts. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge. Parties shall be notified either before or during the hearing or by reference in preliminary reports or otherwise, of the material noticed, including any staff memoranda or data, and they shall be afforded an opportunity to contest the material so noticed. The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence."

At the hearing on the application, agency counsel adequately revealed to the parties the various technical factors within the agency's specialized knowledge of which notice may be taken and of the problems presented by certain technical aspects of the value-of-services versus the cost-of-services rate analysis. The parties knew that the Commission was viewing with apprehension the possible impact of the credit to be allowed upon the integrity of the comprehensive tariff structure then in effect. The agency counsel's statements to that effect were no doubt understood by

---

**12.** The Commission did not err in not insisting on a more profound study of the proposed credit. A comprehensive study, if made at that point, would have caused an unnecessary financial burden to Bell. Without some meaningful experience period under the federally-mandated program, a study would not have revealed any useful information.

**13.** Since protestants elicited no evidence at the hearing to show what components should be used to calculate the cost savings to Bell, they

tacitly conceded the Commission's authority to act in a cautious and protective manner when entering the uncharted field of credit allowances. *State ex rel. Cartwright v. ONG,* supra note 3 at 1347. The Commission's own recalculation of the credit level and its establishment of a lower rate was doubtless intended to protect the utility from an undue loss of revenue that would be injurious to public interest.

**14.** *C.F. Braun & Co. v. Corporation Commission,* Okl., 609 P.2d 1268, 1273–1274 [1980].

the representatives of the parties. They had ample opportunity to present proof in contest. Neither party came forth with any refuting data.

AFFIRMED.

IRWIN, C.J., BARNES, V.C.J., and LAVENDER, HARGRAVE and WILSON, JJ., concur.

SIMMS, J., dissents.

HODGES, J., not participating.