2002 OK CIV APP 125

**CHESAPEAKE OPERATING, INC. and Chesapeake Exploration Limited Partnership, Applicants/Appellees,**

v.

**BURLINGTON RESOURCES OIL & GAS COMPANY, Respondent/Appellant.**

No. 97,129.

Court of Civil Appeals of Oklahoma, Division No. 3.

Aug. 30, 2002.

Certiorari Denied Dec. 3, 2002.

Billy M. Croll, Oklahoma City, OK, for Respondent/Appellant.

John C. Moricoli, Jr., Philip A. Schovanec, Freda L. Williams, Oklahoma City, OK, for Applicant/Appellee.

Opinion by BAY MITCHELL, Judge.

¶ 1 Appellant, Burlington Resources Oil & Gas Company ("Burlington") appeals a pooling order of the Oklahoma Corporation Commission ("Commission"), granted upon application of Appellees, Chesapeake Operating, Inc. and Chesapeake Exploration Limited Partnership ("Chesapeake"). Having reviewed the record, we affirm.

### Factual Background and Procedural History

¶ 2 Chesapeake applied to the Commission for an order pooling the Brown Dolomite, Virgil, Missouri, Des Moines (a.k.a. Granite Wash), Atoka and Morrow common sources of supply underlying all of Section 36, Township 11 North, Range 23 West, Beckham County, Oklahoma. The Commission granted Chesapeake's pooling application. Burlington appeals the Commission's pooling order, arguing that (1) the Commission is without jurisdiction to issue a pooling order because a private joint operating agreement ("JOA") exists between Burlington and Chesapeake; (2) no emergency existed requiring the Commission to issue a pooling order prior to determining whether a JOA exists between Burlington and Chesapeake; (3) it was reversible error for the Commission not to determine if a JOA exists between Burlington and Chesapeake; (4) the Commission misinterpreted the law in refusing to consider the record evidence that a JOA exists; and (5) even if the Commission properly exercised its authority to pool Burlington's interest with respect to the other common sources of supply, it did not have the power to do so regarding the Des Moines common source of supply because the Des Moines was already producing in Section 36, only one well is permitted to produce in a single unit for each common source of supply, and Chesapeake had neither applied for nor received the necessary increased density order.

¶ 3 In 1980, El Paso Natural Gas Company ("El Paso"), Exxon Company USA ("Exxon"), and Universal Resources Corporation ("Universal"), and several other companies entered a JOA by which they unitized their acreages in a four-section area including Sections 25–11N–23W, 30–11N–22W, 31–11N–22W, and 36–11N–23W, and designated Universal as the Operator of the Contract Area. With the exception of a few owners in Section 36 who did not join the JOA, the companies owned the vast majority of interests in the four sections. The parties calculated their respective interests in the Contract Area by dividing the number of acres they owned by the total number of acres in the four sections, without regard to the sections in which they actually owned interests. The parties agreed that Universal would get credit for all of the acreages not subject to the JOA (the interests that would have to be pooled by order of the Commission). Accordingly, Universal's pooling application did not name El Paso or Exxon as respondents, given that both companies were unitized along with Universal under the JOA. A deep test was drilled—the Marriott # 1–36—which served to hold the original pooling orders.

¶ 4 Burlington later succeeded to El Paso's interest in the four-section area, and Questar

Exploration and Production Company ("Questar") succeeded to Universal's interest.

¶ 5 In 2000, R. Michael Lortz acquired an interest in Section 36 from Marcus Fuller, one of the owners who was not subject to the JOA but whose interest in the Marriott # 1–36 was force pooled by Universal pursuant to Order No. 169326, dated May 14, 1980, as amended by Order No. 170290, dated June 2, 1980 ("the original pooling orders").

¶ 6 Wishing to drill an additional well in Section 36, Lortz applied to the Commission on January 16, 2001, seeking to clarify and amend the original pooling orders to add provisions regarding the drilling of subsequent wells, designation of an operator of subsequent wells, compensation in lieu of participation, election periods, and designation of the prior orders as "unit pooling." Lortz named all of the owners—including Burlington and Exxon, even though they were not subject to the original pooling orders Lortz was seeking to amend—as respondents to his application.

¶ 7 After a hearing, the Commission issued Order No. 449239 on February 20, 2001, holding that Order No. 169326 as corrected by Order No. 170290 is a unit pooling having continuing effectiveness by virtue of the initial Section 36 well; that those parties who participated in the drilling of the Section 36 well pursuant to the original pooling orders are deemed to be parties having the right to drill and participate in a subsequent well; that those parties failing to participate pursuant to the terms set forth in the new order would forfeit their rights for further unit participation; and specifying the terms of both election periods and compensation in lieu of participation. Burlington received notice of Order No. 449239 but did not appeal, given that it was not subject the original pooling orders amended thereby.

¶ 8 Lortz sent a well proposal and AFE to Burlington the following week via certified mail, as required by Order No. 449239, proposing the drilling of an additional well in Section 36 and requesting an election as to Burlington's participation. Again, believing

it was not subject to Order No. 449239 because it was not subject to the original pooling orders, Burlington never sent a written response to Lortz's request. Under the terms of the subsequent well provision of Order No. 449239, failure to make a written election to a written well proposal results in the respondent defaulting to the cash-consideration-in-lieu-of-participation provision whereby it receives $300 per acre plus 1/8 royalty and forfeits its rights in further unit participation.

¶ 9 Also in ·February 2001, Chesapeake succeeded to the interests of Questar in Sections 30 and 31 of the four-section unit covered by the JOA. Several months later, in July of 2001, Chesapeake entered into a letter agreement with Lortz to obtain, upon completion of the well, an assignment of his interest in Section 36.

¶ 10 On August 4, 2001, shortly before the 180–day period to commence a proposed well expired, Chesapeake, utilizing Lortz's authority under the subsequent well provision of Order No. 449239, commenced well operations for the Unit well, the Marriott # 1–36.

¶ 11 On August 30, 2001, Chesapeake notified Burlington that it was proceeding to drill the Marriott # 1–36 as outlined in Lortz's February 21, 2001 letter. Chesapeake enclosed a check for Burlington's interests pursuant to the cash-consideration-in-lieu-of-participation provision of said order, believing that Burlington had elected out of the well by failing to respond in writing to Lortz or pay its share of the well costs.

¶ 12 Burlington returned the check to Chesapeake on September 21, 2001, alleging it was not bound by Order No. 449239, that it was entitled to elect under the JOA because Burlington and Chesapeake share a common interest under the JOA and because it participated in the in the original well under the JOA.[1]

¶ 13 Chesapeake disputes that it is a party to the JOA in Section 36, arguing that it received its interest in Section 36 from Lortz, whose interest was not subject to the JOA.

---

1. If Burlington were to elect under the JOA, it could participate in subsequent unit development, whereas Burlington would be precluded from participating in subsequent unit development under the terms of the pooling order because it failed to elect and pay its share of costs in response to Lortz's February 21, 2001 letter.

Chesapeake does not deny, however, that its interests in Sections 30 and 31 may be subject to the JOA and that the JOA is a four-section operating agreement that covers Section 36. Further, Chesapeake apparently calculated Burlington's interest in Section 36 (approximately 31%) based on the terms set forth in the JOA, not record title.

¶ 14 Unable to resolve its dispute with Burlington, Chesapeake filed an application with the Commission on September 21, 2001, requesting that, if the Commission agreed that Burlington has an open interest, it issue an order pooling Burlington's interest in the six named common sources of supply in Section 36, giving Burlington a five-day election period, and requiring Burlington to tender its proportionate share of estimated completed well costs with its election into an escrow account until Burlington has resolved its title issue by final, unappealable order in an Oklahoma court of general jurisdiction. Because the well was presently drilling and nearing completion, Chesapeake sought expedited review of its pooling application.

¶ 15 After a hearing, the ALJ found that Order No. 449239 effectively pooled the owners in the unit, including Burlington, and that it established a plan of development for the unit and all the owners therein. Accordingly, the ALJ dismissed Chesapeake's pooling application, determining that the matter was *res judicata* based on prior orders of the Commission. The ALJ found that since Burlington did not respond timely to Lortz's proposal letter and AFE, it had, by default, elected out of the second well and future unit operations in Section 36. Burlington appealed.

¶ 16 On appeal, the Referee found that Lortz, in his pooling application, failed to plead or otherwise express any intent to bring Burlington—or any of the other Section 36 interest owners who had participated in the original well pursuant to the JOA rather than the original pooling orders—within the purview of those original pooling orders. The Referee concluded that Burlington was thus without proper notice of the nature of the proceedings to be conducted in regards to its interest. In addition, the Referee noted that the express language of Order No. 449239 demonstrates the Commission's intent to apply the original pooling orders as amended only to those parties who participated in the drilling of the initial well under the original pooling orders. Accordingly, the Referee concluded that to make Burlington subject to the original pooling orders through the clarification order would be a violation of Burlington's procedural due process rights, and reversed the ALJ's determination that Burlington was subject to the original pooling orders as amended.

¶ 17 The Appellate Referee further determined that the existence of a dispute between Burlington and Chesapeake as to whether the JOA covers the interests acquired by Chesapeake in the four-section area does not function to deprive the Commission of its jurisdiction to apply the State police power to pool Burlington's interest in the present well. Noting that the Commission is without jurisdiction to determine private disputes—such as whether the JOA covers the interest Chesapeake acquired from Questar and extends to the non-JOA interest in Section 36 that Chesapeake acquired from Lortz—the Referee concluded that Burlington's remedy would be to file an action in the district court to adjudicate its claim that, in light of the JOA, the Commission's pooling order is void as to Burlington's interest. Accordingly, the Referee determined that it was proper for Chesapeake to invoke the Commission's pooling power as to Burlington's interest. The Referee recommended that an order issue granting Chesapeake's application for pooling Section 36, providing a five-day period in which Burlington could elect, and requiring Burlington to deposit its share of the production costs into an escrow account pending final resolution of outstanding title disputes.

¶ 18 The Referee also rejected Burlington's argument that the Des Moines (a.k.a. Granite Wash) formation should be deleted from the scope of the order because Chesapeake had not yet sought or received an increased density order giving it permission to drill that particular common source of supply. The Referee noted that the Commission consistently grants pooling applications containing common sources of supply that require additional increased density authority before drilling and that 52 O.S. Sec-

tion 87.1 requires only that an owner propose to drill a well to a common source of supply. The Referee found that these facts, coupled with the presumption that an operator will comply with Commission rules, regulations, and orders in its actions, favor the inclusion of the Des Moines (a.k.a. Granite Wash) foundation within pooling order to provide orderly development thereof.

¶ 19 On December 8, 2001, the Commission adopted the Referee's findings and recommendations and issued Order No. 458030, force pooling the interests of Burlington in the Brown Dolomite, Virgil, Missouri, Des Moines (a.k.a. Granite Wash), Atoka, and Morrow common sources of supply underlying all of Section 36, Township 11 North, Range 23 West, Beckham County, Oklahoma; setting an election period of five days from the date of the order; requiring those interest holders who elect to participate in production to pay their estimated proportionate share of the well costs to Chesapeake within five days of the order; and mandating that Chesapeake sequester such funds in a segregated escrow account until such time as any pending title disputes have been resolved between the parties by agreement or final unappealable judgment in a court of competent jurisdiction. The Commission reasoned that its pooling order is "just and reasonable and will afford each owner in the unit the opportunity to recover or receive without unnecessary expense his just and fair share of the production from the unit" and that it is needed "to avoid the drilling of unnecessary wells and to protect correlative rights."

## Standard of Review

 ¶ 20 Article 9, § 20 of the Oklahoma Constitution mandates the use of a "substantial evidence" test for reviewing decisions of the Commission in cases that do not involve constitutional issues. *MCI Communications Corp. v. State,* 1991 OK 86, ¶ 22, 823 P.2d 351, 358 (holding that review of orders of the Commission shall be judicial only and not extend further than to determine whether the Commission has regularly pursued its authority, and whether its findings and conclusions. are sustained by the law and substantial evidence); *El Paso Nat'l Gas v. Corporation Comm'n,* 1981 OK 150, ¶ 6, 640 P.2d 1336, 1338. "Under such

rule the determination of whether substantial evidence exists to support a Corporation Commission order does not require that the evidence be weighed, only that there be evidence tending to support such order." *El Paso,* at ¶ 6, 640 P.2d at 1338, *citing Yellow Transit Co. v. State,* 1947 OK 45, 178 P.2d 83. In so doing, we must examine the totality of the record and determine that the proof is more than a mere scintilla. *MCI,* at ¶ 22, 823 P.2d at 358, *citing Teleco, Inc. v. Corporation Comm'n,* 1982 OK 124, ¶ 6, 653 P.2d 209, 212.

 ¶ 21 "A presumption of correctness accompanies the Corporation Commission's findings in matters it frequently adjudicates and in which it possesses expertise." *Smith Cogeneration Mgmt., Inc. v. Corporation Comm'n,* 1993 OK 147, ¶ 9, 863 P.2d 1227, 1232. Indeed, the Commission has wide discretion in the performance of its duties and "this court may not substitute its judgment on disputed questions of fact unless the findings are contrary to law or unsupported by substantial evidence." *MCI,* at ¶ 22, 823 P.2d at 358. The burden is on the appealing party to show that the order in the respects challenged is contrary to the weight of the evidence. *PCX Corp. v. Oklahoma Corporation Comm'n,* 1984 OK CIV APP 50, 699 P.2d 1103.

## Analysis and Review

¶ 22 A review of the supportive facts presented compels the conclusion that the Commission regularly pursued its authority in issuing Order No. 458030 and that said order is supported by substantial evidence.

 ¶ 23 Oklahoma's Conservation of Oil and Gas Act confers upon the Commission the authority to order forced pooling to protect correlative rights of mineral interest owners within a spacing unit. Section 87.1(e) of Title 52 provides in part:

> When two or more separately owned tracts of land are embraced within an established spacing unit, or where there are undivided interests separately owned, or both such separately owned tracts and undivided interests embraced within such established spacing unit, the owners thereof may valid-

ly pool their interests and develop their lands as a unit. *Where, however, such owners have not agreed to pool their interests and where one such separate owner has drilled or proposes to drill a well on said unit to the common source of supply, the Commission, to avoid the drilling of unnecessary wells, or to protect correlative rights, shall, upon a proper application therefor and a hearing thereon, require such owners to pool and develop their lands in the spacing unit as a unit.* 52 O.S.2001 § 87.1(e) (emphasis added). The Commission "has the sole authority to adjust the equities and to protect the correlative rights of interested parties." *Woods Petroleum Corp. v. Sledge,* 1981 OK 89 ¶ 6, 632 P.2d 393, 396.

■ ¶ 24 It is undisputed that Burlington has not agreed to pool its interests with Chesapeake. Indeed, this disagreement between the parties is the genesis of the present action. In addition, the Commission had evidence before it of a drilling proposal by Lortz, commencement of a well within 180 days thereof by Chesapeake, and a proper pooling application by Chesapeake. These factors meet the express terms of 52 O.S. 2001 § 87.1(e) set forth above, under which the Commission is empowered to require owners to pool their interests and develop their lands as a unit.

¶ 25 Burlington's underlying argument—that it should not be subject to the Commission's force pooling order and the Commission is without jurisdiction to force pool Burlington because a private agreement, the JOA, controls—is not a dispute over rights and equities of interest owners within a drilling and spacing unit "which actually affects [correlative] rights within a common source of supply and thus affects the public interest in the protection of production from that source as a whole," but a private dispute over the application and interpretation of a contract. *Samson Resources Co. v. Corporation Comm'n,* 1985 OK 31, ¶ 9, 702 P.2d 19, 22; *see also Atlantic Richfield Co. v. Tomlinson,* 1993 OK 106, 859 P.2d 1088. "[D]isputes over *private rights* are properly brought in the district court .... the [C]ommission's jurisdiction is limited to protection of public rights in development and production of oil and gas." *Leck v. Continental Oil Co.,* 1989

OK 173, ¶ 7, 800 P.2d 224, 226 (emphasis in original). Interpretation of the applicability of the JOA would be beyond the Commission's conferred jurisdiction because it concerns a dispute between private parties in which the public interest in correlative rights is not concerned. *Id.* Accordingly, Burlington's recourse properly lies with the District Court.

■ ¶ 26 Burlington's claim that the Commission did not have the power to pool Burlington with regard to the Des Moines (a.k.a. Granite Wash) common source of supply because Chesapeake does not yet have the requisite increased density order is likewise without merit. As stated by the Appellate Referee, "[t]he Commission has consistently granted pooling applications containing common sources of supply that would require additional increased density authority before a well could be drilled .... [and presumes] that an operator will comply with the Commission's rules, regulation and orders in its actions." Given the Commission's substantial expertise in this area, we must presume the correctness of these findings as they are not otherwise contrary to law. *Smith* ¶ 9, 863 P.2d at 1232. Indeed, 52 O.S.2001 § 87.1(e) requires only that an applying owner "proposes to drill a well on said unit to the common source of supply" for the Commission to exercise its pooling power. Accordingly, it was within the Commission's jurisdiction and authority to include the Des Moines common source of supply in Order No. 458030.

*Conclusion*

¶ 27 We find the Commission regularly pursued its authority under its rules and that the pooling order was within its discretion and supported by substantial evidence. Accordingly, Order No. 458030 of the Oklahoma Corporation Commission is hereby AFFIRMED.

HANSEN, P.J., and ADAMS, J., concur.